IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL MCCREADY and | : | |
| DARLENE MCCREADY, as Attorneys-in-Fact for | : | |
| WILLIAM SAUNDERS, JR., | : | **CIVIL ACTION** |
| | : | |
| **Plaintiffs,** | : | **NO. 11-7670** |
| | : | |
| v. | : | |
| | : | |
| WAYMON WOMBLE et al, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## MEMORANDUM OPINION

**Tucker, C. J.**                                                    **April 22, 2014**

　　This is a civil rights case.  Plaintiffs Michael and Darlene McCready ("Plaintiffs" or the

"McCreadys"), as attorneys-in-fact for William Saunders, Jr. ("William"), bring this action

against Defendants Waymon Womble ("Womble"), the City of Philadelphia, the Department of

Human Services ("DHS"), [1] William Saunders, Sr. ("Saunders, Sr."), and Theresa Suttmoeller

("Suttmoeller") pursuant to 42 U.S.C. § 1983 and state tort law for grievous injuries William

suffered at the hands of Suttmoeller on July 14, 1999.  Plaintiffs contend that Womble and the

City of Philadelphia ("City Defendants" or "Moving Defendants") are liable for placing William

in the violent and abusive home Suttmoeller shared with William's father, Saunders, Sr., and

failing to investigate the escalating reports of Suttmoeller's abuse of William, then seven years-

old. The City Defendants now move for summary judgment on Plaintiffs' § 1983 claims because

---

[1] Although the Complaint names the Philadelphia Department of Human Services ("DHS") as a defendant, "DHS [does not have] an independent corporate existence from the City of Philadelphia; therefore, all claims against them must be brought in the name of the City." Costobile-Fulginiti v. City of Philadelphia, 719 F. Supp. 2d 521, 525 (E.D. Pa. 2010) (citing 53 P.S. § 16257 and Burton v. City of Philadelphia, 121 F. Supp. 2d 810, 812 (E.D. Pa. 2000)).  Accordingly, all claims against DHS will be dismissed.

they claim Plaintiffs cannot establish that Womble deprived William of a constitutionally

protected right, and that such deprivation was caused by an unconstitutional policy or widespread

custom or practice of the City of Philadelphia.  Upon consideration of the parties' motions with

briefs and exhibits, and for the reasons set forth below, the City Defendants' motion will be

denied.

## I.      FACTUAL BACKGROUND[2]

### A.  William is Removed from His Biological Mother's Care and Placed with the McCreadys, Who Plan to Adopt Him

William was born on January 2, 1992 to Angela Williams and Saunders, Sr. (Pls.' Ex. A.)

William, as an infant and a toddler, was delayed in all areas of his development.  He was

identified as having an I.Q. borderline for mental retardation and he had difficulty with bed

wetting. (Pls.' Ex. D; Defs.' Ex. D.) William's mother was unable to adequately care for William

and neglected him and his siblings.  On March 27, 1993, shortly after William's first birthday,

William was removed from his mother's care and committed to the custody of DHS.[3]

Specifically, William was monitored by the Continuing Services Unit of DHS.[4]

On February 21, 1996, shortly after William turned four years old, William was placed in

foster care with Michael and Darlene McCready. (Pls.' Ex. F.)  The McCreadys had acted as

foster parents for a number of years. Further, the McCreadys had received professional training

---

[2] Unless otherwise noted, the following facts are undisputed.  The facts are viewed in the light most favorable to the Plaintiffs as the non-movants.

[3] The term "committed to DHS" means that DHS was responsible for providing care or supervision of care to a child so committed. (Womble Dep. 29:7-14.)  This then means that DHS becomes responsible for the permanent placement of that child. (Id.)

[4] "Continuing services" meant that services will "continue" with the family until the "problems [that led to DHS involvement] were resolved or children aged out," meaning they either turned 18 years-old or left the home. (Womble Dep. 14:20-15:1.)

from Infant and Youth Care, Inc. ("IYC")[5] in general foster care and had been specially trained in "therapeutic foster care" for children with special needs like William. (Pls.' Ex. G.)  IYC was also the contracted provider responsible for placing William with the McCreadys.  By all accounts, the McCreadys were providing good care of William. (Id.) Indeed, a February 22, 1998 progress report stated, among many other positive comments, that "William has a loving and trusting relationship with the foster family." (Pls.' Ex. C.)

Because of William's age, the neglect he had experienced from his mother, the absence of his biological father, and the amount of time he had been in foster care, William was slated as a child with a goal of adoption. (Pls.' Ex. G.)  In late 1997, the McCreadys, who had adopted other foster children, decided to adopt William.  At or around this time, Defendant Womble was the assigned DHS caseworker for William.  Womble made a recommendation to the Family Court Division of the First Judicial District of Pennsylvania ("Family Court") on December 20, 1997 to terminate the parental rights of Angela Williams and Saunders, Sr. and to make the goal of William's placement adoption by the McCreadys. (Pls.' Ex. J.)[6]

### B.  William's Father, Saunders, Sr., Resurfaces and the Goal of William's Placement Changes from Adoption to "Reunification"

In December 1997, after the recommendation to terminate parental rights had been made, Saunders, Sr. resurfaced and sought to establish a relationship with William. (Pls.' Ex. K.) Saunders, Sr. had had little to nothing to do with William since his birth. (Pls.' Ex. C; Womble

---

[5] IYC is currently known as New Foundations, and is referred to as such in certain depositions.

[6] "Placement" occurs when "a child has been committed to the Department of Human Services and will be removed from the parent or home of origin to either foster parents or [placed] in a group home." (Womble Dep. 56:10-15.) After a child is committed, DHS attempts to find permanent placement for the child with either a family member or with a "placement agency," such as foster care, a residential facility, or to place the child for adoption. (Id. at 29:11-30:7.)  Prior to December 20, 1997, it appears that DHS was attempting to help Angela Williams regain custody of William.

Dep. 84:23-84:6,107:1-7, 93:15-94:1.)  Nevertheless, Saunders, Sr. sought custody of William. At the time Saunders, Sr. sought custody of William, Saunders, Sr. lived with his fiancée, Suttmoeller.

A hearing was held regarding William's dependency on February 9, 1998.  At this hearing, Womble recommended that William remain committed to DHS and that no "goal change" be made at that time.  (Defs.' Ex. D.) However, Saunders, Sr. received court ordered visitation with William at the IYC offices in Chester, Pennsylvania. (Id.)  Suttmoeller, with Saunders, Sr., also began visiting William at IYC.  Womble never personally met with Saunders, Sr. or Suttmoeller at any time prior to placement of William in their custody and never attended any of these supervised visits.  (Womble Dep. 93:22-94:1, 112:6-11.)  Further, Womble never obtained any documentation from anyone at IYC regarding these visits.  As such, DHS' file contains no documentation of how many visits William had with Saunders, Sr. and Suttmoeller, or how William interacted with them. (Id. at 95:20-96:21.)

Following a court hearing on May 14, 1998, Womble reportedly completed court ordered Child Line background checks on Saunders, Sr. and Suttmoeller and reported that both had been "cleared" — meaning that he found no reports of child abuse for either party.  (Defs.' Ex. Q; Pls.' Ex. F.)  However, other than Womble's notes stating he performed a Child Line check, there is no documentation of clearance in DHS' file. [7]  In addition, the Family Court further ordered that Womble "devote [his] full time" to getting a psychological evaluation of Saunders, Sr., and that William was to have a three night weekend visit with Saunders, Sr. from October 9-12, 1998. (Defs.' Ex. F.)  It is unknown whether this overnight visit ever took place.

---

[7] According to Plaintiffs' expert, Dr. Richard J. Gelles, DHS' Child and Youth Policy and Operations Manual requires that before placement of a child with a caretaker is made, the caretaker and any other adults in the household must be cleared by Child Line. (Pls.' Ex. BB at 5.)  However, "[a] certificate of clearance for Ms. Suttmoeller was never documented in the DHS record." (Id.)

In an October 7, 1998 Placement Amendment Review, [8] Womble reported that "[c]ircumstances changed very favorably that father surfaced in Dec '97 and has been very positive ever since." (Pls.' Ex. K; Defs.' Ex. E.)  Womble further noted that IYC reported that Saunders, Sr. and Suttmoeller had regularly been to IYC for visits, and that William would be discharged to his father pending the results of a psychological evaluation. (Defs.' Ex. E.)  Thus, as of October 7, 1998, the goal of William's placement was explicitly changed from adoption by the McCreadys to "reunification" with his father (Id.)  In addition, also on October 7, 1998, a court hearing was held in which Womble recommended to the Family Court that Saunders, Sr. and Suttmoeller's visits to William be changed from supervised visits at IYC to day visits at the Saunders, Sr./Suttmoeller home. (Id.)  Just as with the visits at IYC, Womble did not attend any of these day visits, and there is no documentation regarding these visits. (Womble Dep. 105:5-106:7.)

On October 16, 1998, without having first completed psychological evaluations of either Saunders, Sr. or Suttmoeller, Womble completed a risk assessment for William.[9]  Womble reported that he was "unable to assess" Saunders, Sr. and Suttmoeller in areas such as "parenting skills/knowledge," "alcohol/substance abuse," and "relationships with children." (Pls.' Ex. N.)

---

[8] Womble testified that a Placement Amendment Review is a document used to review a Family Service Plan, usually every six months. (Womble Dep. 91:3-92:1.)  It is unclear to the Court when this particular Placement Amendment Review, recommending "reunification," was completed.  The document itself has no discernable date. The parties have each included the Placement Amendment Review in their exhibits, and cite to it in their briefs. Defendants include the Placement Amendment Review as part of a series of documents which includes the Family Service Plan and what appears to be another Placement Amendment Review recommending "adoption." (See Defs.' Ex. E.)  The Family Service Plan is dated March 6, 1998.  However, according to Defendants' brief, the relevant Placement Amendment Review recommending "reunification" is also dated March 6, 1998. (Defs.' Mot. Summ. J. ¶10.)  Plaintiffs' exhibit, meanwhile, cites the Placement Amendment Review in isolation, with no hint as to what other documents the Placement Amendment Review may have been attached to. (See Pls.' Ex. K.)  It is thus unclear to the Court how Plaintiffs determined the date of the Review was October 7, 1998.  For purposes of resolving this motion, however, the Court accepts the October 7, 1998 date asserted by Plaintiff — which is more consistent with Womble's testimony and the general timeline of events.

[9] Risk assessment is a document DHS uses to assess the risk to children who are in a home or in placement agencies. (Womble 35:16-36:1.)

5

With regard to "parenting skills/knowledge," Womble specifically stated, "We don't know enough about them.  Ms. Suttmoeller has adult children." (Id.)[10]  With regard to "alcohol/substance abuse," Womble wrote, "We don't know them to drink but we have little exposure to them." (Id.)[11]  With regard to "relationships with children," Womble averred "[w]e have no prior reports on them" and "[w]e need to see them more so we can assess." (Id.)  Despite this obvious absence of information, Womble concluded that Saunders, Sr. and Suttmoeller were only a "moderate risk" to William. (Id.)  Womble's supervisor, Miriam Kauderer, concluded Saunders, Sr. and Suttmoeller were a moderate/low risk. (Id.)  No other risk assessment was performed prior to placing William in the Saunders, Sr./Suttmoeller home.

### C.  Events Leading Up to William Being Permanently Discharged from the Custody of DHS to the Custody of Saunders, Sr. and Suttmoeller on April 29, 1999

#### 1.  Saunders, Sr.'s Psychological Evaluation

Saunders, Sr. underwent psychological evaluation on October 29, 1998 and November 5, 1998 by Sara V. Shack, Psy.D. ("Dr. Shack") at Assessment & Treatment Alternatives.  Dr.

---

[10]  According to Suttmoeller, her daughter Kristine moved out of the home Suttmoeller shared with Saunders, Sr. because, among other reasons, "there was a lot of abuse in the house." (Suttmoeller Dep. 20:11-16.)  Suttmoeller's son Keith had also been present on one occasion when Saunders, Sr. was violent with Suttmoeller. (Id. at 139:20-140:5.)  In retrospect, Suttmoeller's concedes that in 1998 and 1999, she was not fit to be raising a seven year old, and that the Saunders, Sr./Suttmoeller's home was not safe for anyone, let alone a child of William's age. (Id. at 99:21-100:15.)

[11]  Saunders, Sr. and Suttmoeller met in December 1996 and moved in together in early 1997 — only 19 days after meeting. (Pls.' Ex. L.)  Prior to this, Suttmoeller had been living a transient life for several years after being evicted from multiple apartments and hotels for failure to pay rent. (Suttmoeller Dep. 27:12-28:8.)  At that time, and throughout the time DHS was involved in placing William in their home, Saunders, Sr. and Suttmoeller were active alcohol and drug abusers. (Id. at 44:1-45:6, 47:9-18, 48:15-49:1, 50:22-51:4.)  Saunders, Sr. abused cocaine and marijuana. (Id. at 66:3-10.)  Suttmoeller and Saunders smoked marijuana and drank every evening. (Id. at 46:21-49:1.)  Suttmoeller testified that there were many times while she was living with Saunders, Sr. that she would blackout and not remember anything. (Id. at 47:15-48:13.)

Additionally, Saunders, Sr. would frequently physically abuse Suttmoeller. (Id. at 37:7-23.)  Saunders, Sr. would punch and grab Suttmoeller by the neck and attempt to choke her. (Id. at 41:1-24.)  Prior to William moving in with them, Saunders, Sr. had been arrested following an argument with Suttmoeller wherein Saunders, Sr. threatened her with a box cutter. (Id. at 62:20-63:12.)  Suttmoeller sought a protection from abuse order against Saunders, Sr. (Id. at 51:21-42:19.)

Shack's subsequent November 6, 1998 Report of Mental Health Evaluation is generally

favorable to Saunders, Sr. (Pls.' Ex. D; Defs.' Ex. G.) Dr. Shack did, however, make several

observations of particular importance to this case.  Dr. Shack noted that "[William's] family

history is notable for learning problems and substance use." (Id. at 3.)  Additionally, Dr. Shack

stated that Saunders, Sr. "discussed the plans he and Ms. Suttmoeller devised regarding

afterschool care, homework and discipline.  Mr. Saunders appears to be heavily relying on Ms.

Suttmoeller [to] provide afterschool care and supervise homework."  (Id. at 7.) Dr. Shack further

noted, "Mr. Saunders reports that he plans to use threats and rewards to reinforce [William's]

behaviors.  [Mr. Saunders] was quite candid in his admission that he might use spanking, since

he was raised in that manner, but realizes that he should not." (Id.)  Dr. Shack further observed:

"While Mr. Saunders demonstrated little insight and foresight with regard to [William's custody]

problems or to parenting issues, he did demonstrate the ability to seek help and support from

those around him, particularly his fiancée, Ms. Suttmoeller.  Furthermore, Mr. Saunders

demonstrates stability and consistency with regard to work history and home life." (Id. at 9.)

Dr. Shack concluded by stating: "By the accounts of all interviewed, Ms. Suttmoeller

plays a large role in the Saunders family and is frequently William, Jr.'s primary caregiver.

While the examiner was not asked to formally interview [Ms. Suttmoeller] or observe her

interactions with William, Jr., this type of evaluation would be clearly warranted given Ms.

Suttmoeller's central role in the family." (Id. at 10.) Accordingly, Dr. Shack stated:

> *[I]t is strongly recommended* that Ms. Suttmoeller…undergo a complete psychological
> evaluation to determine her capacity to parent William, Jr.  The examiner should also
> have [the] opportunity to observe the interpersonal interactions between William, Jr. and
> Ms. Suttmoeller….This recommendation is made on the basis that, if placed in his
> father's care, William, Jr. is in reality being placed with a couple who will most certainly
> share the parenting responsibilities.  *William, Jr. should not be moved until Ms.
> Suttmoeller's evaluation is completed.*

(Id.) (emphasis added).

### 2. The Family Court Grants Temporary Physical Custody of William to Suttmoeller

On November 9, 1998, just three days after Dr. Shack's evaluation of Saunders, Sr. was completed, the Family Court granted temporary physical custody of William to Suttmoeller[12]— despite the fact that Dr. Shack's recommended evaluation of Suttmoeller had not yet been performed. (Defs.' Ex. H.; Pls.' Q.)  At the November 9, 1998 hearing, Womble was apparently of the opinion that, consistent with Dr. Shack's recommendation, Saunders, Sr. and Suttmoeller should not receive custody of William until Suttmoeller's evaluation was completed.  (Defs.' Ex. H) ("We believe that in fulfilling the recommendation of Dr. Shack, Ms. Suttmoeller should have an evaluation before William returns home.")  Nonetheless, Womble affirmed that "DHS will defer to the Court." (Id.) The November 9, 1998 Dependency Review Order mandated that William was to receive "Services to Children in their Own Home" ("SCOH")[13] at the Saunders, Sr./Suttmoeller home, and that such services were to be supervised by Womble. (Id.)  The Family Court further ordered that Suttmoeller undergo psychological evaluation. (Id.)

### 3. As of February 16, 1999, DHS Had Not Complied with the Family Court's November 9, 1998 Dependency Review Order

Ultimately, however, no SCOH had been provided to William as of February 16, 1999. (Defs.' Ex. I.)[14]  In addition, also as of February 16, 1999, Suttmoeller still had not undergone

---

[12] It appears that temporary physical custody was given to Suttmoeller specifically because Saunders, Sr. was not present at the hearing that day.

[13] SCOH constituted services provided to children by an independent contractor under the supervision of DHS.  The SCOH worker would visit the child in their home on a weekly basis to determine whether the child's needs were being met and whether the family was meeting the objectives of the Family Service plan. (Womble Dep. 52:8-53:7.) DHS would receive quarterly reports from the SCOH worker, and at times incidental reports if something occurred within the three month period of the quarterly reports. (Id. at 53:12-21, 147:11-148:13.)

[14] The apparent reason for this delay was that, due to some unidentified miscommunication, the independent contractor initially identified to provide SCOH did not provide these services. (Defs.' Ex. I.)

the psychological evaluation recommended by Dr. Shack on November 6, 1998 and ordered by the Family Court on November 9, 1998. (Id.)[15]  Thus, a period of more than three months had elapsed in which DHS had no contact or supervision of William's placement in the Saunders, Sr./Suttmoeller home and Suttmoeller had not been evaluated.  Despite these facts, Womble somehow recommended to the Family Court that DHS' supervision of William be terminated. (Defs.' Ex. I; Pls.' Ex. S) ("We are recommending that DHS supervision and petition be discharged.  Father and his fiancée appear to have made a good adjustment with William's return home.")  The Family Court's February 16, 1999 Dependency Review Order, however, required that DHS supervision of William continue and once again ordered that Suttmoeller undergo evaluation. (Defs.' Ex. I.)

### 4. Suttmoeller's Psychological Evaluation

Suttmoeller was ultimately evaluated by Dr. Shack on April 8, 1999, and Dr. Shack's report was issued on April 16, 1999. (Defs.' Ex. J; Pls.' Ex. L.) Dr. Shack's report contains a plethora of information and observations of particular importance here.  Dr. Shack begins by noting that Womble "specifically requested that the evaluator [i.e., Dr. Shack] comment on whether [Suttmoeller] is able to bond with [William] and whether it was 'better for the child to be returned home or placed for adoption.'" (Id. at 1.)  However, Dr. Shack remarked that it was "notable that the child in question was already placed with his biological father and Ms. Suttmoeller approximately four months ago." (Id.)  Dr. Shack also noted that Suttmoeller had cancelled two previously scheduled appointments, allegedly due to childcare issues with William, but had nonetheless "refused" when Dr. Shack encouraged her to bring William with her to the evaluation. (Id. at 3.)

---

[15] It is unclear why there was such a delay in scheduling Suttmoeller's evaluation.  According to a January 19, 1999 letter Assessment & Treatment Alternatives sent to Suttmoeller, Suttmoeller's evaluation was scheduled for April 9, 1999. (Defs.' Ex. J.)  This appointment was ultimately rescheduled to April 8, 1999. (Id.)

Dr. Shack made several favorable observations of Suttmoeller. Dr. Shack noted that "Ms. Suttmoeller has carried a large part of the child rearing responsibility, as Mr. Saunders works particularly long hours. While Mr. Saunders showers and dresses [William] each morning, Ms. Suttmoeller is responsible to transport him to and from school and supervise his homework each night." (Id. at 3.)  Dr. Shack avowed that "Ms. Suttmoeller's devotion to her fiancée's son is undeniable." (Id. 6.)  Suttmoeller, who was herself adopted and raised by her maternal aunt, was also described as "appear[ing] to have empathy for [William] and truly wish[ed] for him to have a stable and nurturing home." (Id.)

The evaluation also contained several adverse observations of Suttmoeller.  Dr. Shack stated that because Suttmoeller had not brought William with her to the appointment, she "was unable to evaluate the bond" between Suttmoeller and William. (Id. at 3.)  Additionally, Suttmoeller arrived at the evaluation with two scratch marks on her face, which Suttmoeller claimed was the result of an unprovoked "assault" by one of Saunders, Sr.'s ex-girlfriends. (Id.)  Suttmoeller also reported a current and past history of substance use and abuse.  For instance, Sutmmoeller reported that she had "extensively experimented with drugs and alcohol when she was in early adulthood, specifically with cocaine, acid and marijuana." (Id.)  She also reported that she occasionally drank alcohol and had last had a drink the night before the evaluation. (Id.)  Specifically, Suttmoeller "reported that she and Mr. Saunders had shared a 40 oz[.] bottle of beer the prior evening because she was upset over an incident with [William]." (Id. at 3.)  In addition, when Dr. Shack questioned Suttmoeller about William's bedwetting, an ongoing issue, Suttmoeller initially represented that the wetting was not William's fault; however, later in the interview Suttmoeller reported that "she feels [William] sometimes [wets the bed] on purpose." (Id. at 4.)

During the evaluation, Suttmoeller displayed hostility toward Dr. Shack, and averred that Dr. Shack had "taken advantage" of Saunders, Sr. during his evaluation because he is "slow." (Id. at 4.)  Suttmoeller was irritated by what she considered to be evasive questions, and appears to have taken issue with the fact that it was Dr. Shack (rather than another psychologist) performing the evaluation (Id.)  Suttmoeller also made a "thinly veiled threat" toward Dr. Shack, stating: "The faster I can get this case closed the faster I can hire an attorney to find out if my rights were indeed taken into effect." (Id.)

Overall, Dr. Shack described Suttmoeller as "labile," "angry," and at times "agitated." (Id. at 4, 6.)  Further, during her evaluation, Suttmoeller presented as "grandiose and entitled." (Id.)  Dr. Shack noted that Suttmoeller "appears to have a rigid style of thinking and limited repertoire of problem solving skills." (Id. at 6.)  Thus, despite the favorable qualities Dr. Shack observed, Dr. Shack also expressed her "concern" that "at times Ms. Suttmoeller's own feelings and issues might interfere with her ability to provide for [William] in the manner necessary, as evidenced by her lability in this interview due to her feelings for the examiner." (Id.)

Dr. Shack concluded with three recommendations: (1) Suttmoeller should be offered references for parent advocate groups for children with special needs; (2) Suttmoeller and Saunders, Sr. should take William for an evaluation by a pediatric urologist; and (3) Suttmoeller and Saunders, Sr. should be referred for six to eight sessions of parent counseling. (Id. at 6-7.)  Dr. Shack did not recommend that William be removed from the Saunders, Sr./Suttmoeller household.  Womble never implemented any of Dr. Shack's recommendations.[16]

---

[16] Miriam Kauderer, Womble's supervisor, described Suttmoeller's evaluation as "horrendous" and "well-reported." (Kauderer Dep. 31:11-17, 64:4-22.) Kauderer further testified that she may not have actually seen the evaluation, because often a supervisor may be away or not involved in actual supervision, but would have to sign off on such reports because the child was assigned to that supervisor's unit. (Id. at 31:21-32:10.)

### 5. On the Recommendation of Womble, the Family Court Discharges DHS' Supervision of William

On April 29, 1999, Womble represented to the Family Court that Suttmoeller's April 8, 1999 evaluation "showed no problems for Theresa Suttmoeller to parent/supervise William Saunders." (Pls.' Ex. K.)  Womble recommended to the Family Court that it "discharge [William's] commit[ment]" and "withdraw petition," which Womble testified meant that DHS wanted to "close the case" and no longer supervise William's placement with Saunders, Sr. and Suttmoeller. (Id.; Womble Dep. 176:2-177:19.)  Following Womble's recommendation, the Family Court's April 29, 1999 Dependency Review Order discharged DHS supervision of William. (Pls.' Ex. K.)  Thus, as of this date, William was no longer committed to DHS and Saunders, Sr. retained full custody of William free of state supervision.

### D. May 16, 1999 Incident Report

On May 16, 1999, just seventeen days after DHS supervision ended, DHS received an anonymous phone call advising that William had a scab over his eye and was rubbing his backside. (Defs.' Ex. L.) The caller reported that when William was asked about the eye injury, he responded that he could not tell. (Id.) The caller reported to DHS that Suttmoeller (identified as the "father's paramour") beat William "for hours and neighbors hear[d] him screaming," and that the "majority of the beatings happen[ed] after school while doing homework and [William was] hit repeatedly until his lessons [were] completed." (Id.)  Additionally, the caller stated the child "appear[ed] to be mentally slow" and that Suttmoeller "lack[ed] the ability to handle his special needs." (Id.)  Still further, the caller stated that the previous week Suttmoeller was "seen hitting on child outside in front of neighbors" while Saunders, Sr. was present. (Id.) Saunders, Sr., however, had "failed to say or do anything to protect" William. (Id.)

12

Because Womble was William's previous caseworker, the information from the call was forwarded to him for investigation.  On May 18, 1999, Womble interviewed William, Saunders, Sr., and Suttmoeller — apparently together. This is the first recorded interaction between William and Womble.  Womble also spoke with officials at William's school.

According to Womble's report, William informed Womble that Suttmoeller hit him, but denied that she had caused the eye injury.  (Id.) William also denied that Suttmoeller hit him for wetting his pants. (Id.)[17] For his part, Womble observed no visible bruises, scars, or wounds on William's buttocks.  (Id.) Womble did, however, observe what he considered to be a "superficial" scab near William's eye, but concededly made no attempt to determine the cause of the scab. (Id.; Womble Dep. 194:12-196:2.)  In addition, according to Womble, a counselor and the school nurse at William's school had interviewed and observed him, and had found "only old faded dark marks" that they did not believe to be consistent with abuse. (Id.)

Suttmoeller reported to Womble that she *did* spank William for wetting his pants, that William "doesn't say anything," that she had "never beaten [William] outside," and that she did not make any bruises on William. (Defs.' Ex. L.) Suttmoeller also informed Womble that she *would* spank William again. (Id.)  Womble, however, concluded that Suttmoeller "will use good judgment[;] that is, not continue to beat [the] child, [and] that she will go for parenting classes based on how she has cooperated in the past." (Id.)  During this interview, Womble also learned that Saunders, Sr., like Suttmoeller, believed that William's bedwetting was something that he could control.  (Id.) Saunders, Sr. reported that he would send William to his room as punishment for bedwetting, but did not use physical punishment. (Id.; Womble Dep. 197:8-198:2.)

---

[17] On the report, Suttmoeller is identified as "AP," which Womble testified stands for "Alleged Perpetrator." (Defs.' Ex. L.; Womble Dep. 193:11-194:13.)

Based on this interview, Womble completed a risk assessment on June 11, 1999 which concluded that the "overall severity" and "overall risk" to William on remaining in the Saunders, Sr./Suttmoeller home was "low." (Defs.' Ex. L.; Pls.' Ex. Z.)  Womble also noted that Suttmoeller had "offered some resistance to DHS intervention" and "was reluctant to have [another] court ordered psychological evaluation." (Defs.' Ex. L.)

### E.  June 23, 1999 Incident Report

On June 23, 1999, a little over a month after DHS receive the first anonymous call, DHS received another anonymous call concerning William.  (Defs.' Ex. M.) The caller reported the following to DHS:

> Neighbors who live halfway down the block can hear stepmother smacking child and screaming at child.  Stepmother curses at child and calls child names[:] F------ Dirty N----, Bastard, Mother F------ A------.  Child is heard screaming and crying.  Stepmother tells child he is going to eat his dirty underwear.  Child seen in room everyday looking out window.  This has been going on for two, three weeks.  Father seen standing with his arms crossed watching mother beat child. Yesterday, a neighbor confronted stepmother and stepmother replied, "mind your own business," "I'll take him into another room and beat him," "go ahead and call police and DHS."  Since then shade has been drawn and child has not been seen.

(Id.)

According to Womble's investigation summary, he began his investigation by calling the Saunders, Sr./Suttmoeller home on June 23, 1999. (Id.)[18]  The next day, June 24, 1999, Womble went to the Saunders, Sr./Suttmoeller home. (Id.)  Womble was unable to interview William at this time because, according to Suttmoeller, Saunders, Sr. had taken William to work with him. (Id.) Womble found this to be "unusual." (Id.)  Suttmoeller denied beating William.  Suttmoeller further claimed that she "[didn't] discipline [Wiliam] *now*" because his father takes him to work

---

[18] Womble's investigation summary states that his investigation was conducted on June 23, July 19, July 20, and July 21, 1999.  Accordingly, Womble did not complete his investigation of the June 24,1999 report of abuse until *after* the July 14, 1999 report of abuse — three weeks later.  Womble's investigation summary therefore includes records made both before and after the July 13, 1999 beating.  No risk assessment was completed in the three weeks between the June 24, 1999 report and the July 14, 1999 report.

with him." (Id.) (emphasis added).  Suttmoeller "only admitted to punishing [William] for

urinating in his clothes in May." (Id.)

Womble asked around in the neighborhood to identify the anonymous reporter, but could

not locate the individual.  Womble did, however, speak with neighbors who reported that

Saunders, Sr. and Suttmoeller had beer delivered every night or so, and that they smoked

marijuana. (Id.) Womble also spoke with a "Mrs. Ford," a social worker at St.  Christopher's

Hospital who had evaluated William there.  Mrs. Ford "saw some old bruises" on William but

could not determine the ages of these bruises. (Id.)

Womble concluded that the June 23, 1999 report of abuse was "substantiated[,] as [the]

investigation clearly revealed child was in [an] abusive situation with stepmother/father's

fiancée." (Id.)  Nonetheless, Womble apparently made no attempt to locate or interview William

in the next three weeks, before the July 14, 1999 incident.

**F.  July 14, 1999 Incident**

On July 14, 1999, another anonymous call was placed to DHS concerning William.  A

contemporaneous report states the following:

> A neighbor heard child crying and he heard stepmom banging child into the walls. Child
> cried for a long time.  Neighbor called EMS, EMS arrived at home and they called police.
> Child taken to St. Christopher unconscience [sic].  Child sustained an acute subdural
> hematoma[.]  He had a few day old bruising [sic] on his face, chest and upper torso[.]  He
> had calcified injury on left thigh which denoted an old injury[.]  Parents appeared enibriated
> [sic].  [The Philadelphia Police Department's] Special Victims [Unit] found holes in the wall
> in the child's bedroom [and] in the hallway beside the bedroom which are at the height level
> of [the] child's head.  While child was crying, his father and stepmother[r] were in the home
> and they appeared to be inebriated.  Currently child is having brain surgery.  His condition is
> critical.  It is unknown as to whether[] he will recover from his injuries at this time.

(Defs.' Ex. N.)

William sustained severe injuries, including a cerebral edema, retinal hemorage, and

contusions to his thorax.  (Id.)  He underwent brain surgery to evacuate the hemtoma. (Id.)  DHS

learned of the incident that same day, from a social worker at St. Christopher's Hospital.  For her

abuse of William, Suttmoeller was convicted of aggravated assault and reckless endangerment of

a minor.  She was incarcerated from August 27, 1999 to November 2003, when she was released

on parole. (Suttmoeller Dep. 59:7-16.)

After being hospitalized, William was again taken in by the McCreadys, who ultimately

adopted him.  For a year after the beating, Darlene McCready served as William's primary

caregiver: feeding, bathing, and dressing him because William is physically incapable or

performing these tasks himself. (Darlene McCready Dep. 24:12-28:24.)  William continues to

suffer from the effects of the abuse, including reduced cognitive functioning and

neuropsychological problems.  He has been committed to residential facilities several times.

William will never be able to live independently.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ P. 56(a); <u>see</u> <u>also</u> <u>Levy v. Sterling Holding Co., LLC</u>, 544 F.3d 493, 501 (3d Cir.

2008).  A factual dispute between the parties will not defeat a motion for summary judgment

unless it is both genuine and material. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-

48 (1986); <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is

genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under

the substantive law, it would affect the outcome of the suit. <u>See</u> <u>Anderson</u>, 477 U.S. at 248;

<u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to

admissible evidence in court, it would be insufficient to permit the non-moving party to carry its

burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986).  Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount Communications, Inc., 258 F.3d 132 (3d Cir. 2001).  The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

### III.   DISCUSSION

As is well-known, § 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws. Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.), cert. denied, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995) (internal citation omitted); Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979).  Thus, as a threshold matter, a plaintiff seeking to establish a § 1983 claim "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed

by a person acting under color of state law." Mark, 51 F.3d at 1141 (quoting Moore v. Tartler, 986 F.2d 682, 685 (3d Cir.1993)). Here, that right arises under the substantive component of the Due Process Clause of the Fourteenth Amendment, which bars certain wrongful government action that deprives an individual of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; see also Washington v. Glucksberg, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267, 138 L. Ed. 2d 772 (1997) (the "liberty" specially protected by the Due Process Clause includes the right to bodily integrity) (citing Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

The parties do not dispute that William was abused by Suttmoeller, and that this abuse interfered with William's right to bodily integrity.  The parties do dispute, however, whether the City Defendants may be held liable for that interference.  It is abundantly clear that the actions of Suttmoeller were the direct and immediate cause of William's injuries.  It would also appear that Saunders, Sr., although perhaps never himself physically abusive toward William, at the very least acquiesced to certain physical disciplinary methods employed by Suttmoeller.  Less clear is whether the City Defendants may be liable for the acts and omissions of these private individuals.

**A.  DeShaney v. Winnebago County Department of Social Services**

Any discussion of the viability of Plaintiffs' § 1983 claims against the City Defendants must naturally begin with the Supreme Court's seminal decision in DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).  In DeShaney, the Supreme Court considered the question of whether a county agency had an obligation under the Fourteenth Amendment's Due Process Clause to protect a child from abuse by his biological father while the child was in the father's custody.  The Supreme Court held that no such obligation existed, because "nothing in the language of the Due Process Clause itself

requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Id. at 195.  The Supreme Court emphasized that the Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security"; as such, "[i]t forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." Id.  The Court then opined, "If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." Id. at 196; see also Bright v. Westmoreland Cnty., 443 F.3d 276, 284 (3d Cir. 2006) ("[W]e know from DeShaney that no affirmative duty to protect arises "from the State's knowledge of the individual's predicament.") (citing DeShaney, 489 U.S. at 200).

Accordingly, the general rule established in DeShaney is that the failure of the state to protect a person against private violence does not amount to a violation of the Fourteenth Amendment's Due Process Clause.  However, while this general rule forecloses governmental liability for the failure to protect persons from injury at the hands of private actors, the DeShaney Court also stated that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198.

The first such circumstance is that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199-200 (internal citations omitted); see also id. at 200 (in this circumstance, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to

19

help him, but from the limitation which it has imposed on his freedom to act on his own behalf.")

(internal citation omitted).  This circumstance has come to be known as the "special relationship

exception."  In addition, the Court in DeShaney commented in dicta that "[w]hile the State may

have been aware of the dangers that Joshua [DeShaney] faced in the free world, *it played no part*

*in their creation, nor did it do anything to render him any more vulnerable to them*." Id. at 201

(emphasis added).  DeShaney thus suggested that had the state created the danger, Joshua may

have been able to recover damages even though he was not in state custody.  A number of lower

courts have seized upon this comment to fashion what has come to be known as the "state-

created danger" theory for establishing liability under § 1983.  See e.g., Kneipp v. Tedder, 95

F.3d 1199, 1211 (3d Cir. 1996).[19]  Under the state-created danger theory, § 1983 liability can be

established when the state affirmatively places an individual in a position of danger that the

individual would not otherwise have been in — even in the noncustodial context.

Thus, the general rule that the Due Process Clause provides no basis for a § 1983 cause of

action against state employees who fail to protect a person from harm inflicted by private parties

has two exceptions: (1) the "special relationship" exception; and (2) the "state-created danger"

exception.  In the present case, Plaintiffs' argue that under the state-created danger exception, the

City Defendants can be held liable because Womble affirmatively placed William in danger by

(1) changing the goal of William's placement from adoption by the McCreadys to

---

[19] Other courts of appeals have also recognized the state-created danger exception. See Uhlrig v. Harder, 64 F.3d 567, 572 n. 7 (10th Cir.1995), cert. denied, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir.1993); Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir.), cert. denied, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir.1990); Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir.1989) (predating DeShaney), cert. denied, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990); Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989) (predating DeShaney), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).

"reunification" with Saunders, Sr., and (2) placing William in the violent and dangerous

Saunders, Sr./Suttmoeller home. (Pls.' Resp. Opp'n Mot. Summ. J. 14-16.)[20]

### B.  State Created Danger Exception

The Third Circuit adopted the state-created danger theory of liability under § 1983 in

Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996).  To establish a § 1983 due process claim based

on state-created danger theory, a plaintiff must establish the following elements:  (1) the harm

ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of

culpability that shocks the conscience; (3) there existed some relationship between the state and

the plaintiff; and (4) a state actor affirmatively used his or her authority in a way that created a

danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not

acted at all. Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006) (internal citations

omitted).

Although the precise framework for liability under the state–created danger theory varies

among the circuits,[21] it is important to emphasize that liability under the state-created danger

theory does not lie in cases involving a mere "failure to protect."  As the Seventh Circuit

explained in Reed v. Gardner, "[i]naction by the state in the face of a known danger is not

enough to trigger the obligation." 986 F.2d 1122, 1125 (7th Cir. 1993).  Rather, some affirmative

conduct on the part of the state in placing the plaintiff in danger is required. See D.R. by L.R. v.

Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc)

("Liability under the state-created danger theory is predicated upon the states' [sic] affirmative

acts which work to plaintiffs' detriments in terms of exposure to danger."); Brown v. Grabowski,

---

[20] The special relationship exception is thus not at issue, and the Court therefore does not discuss Moving
Defendants' arguments that the special relationship exception does not apply. (See Defs.' Mot. Summ. J. 13-14.)

[21] See e.g., Uhlrig v. Harder, 64 F.3d 567 (10th Cir. 1995) (articulating a five-part test to determine if a defendant
created a "special danger" to support liability under the theory).

922 F.2d 1097, 1100-01 (3d Cir. 1990) (emphasizing that DeShaney holds "that a state's failure

to take affirmative action to protect a victim from the actions of a third person will not, in the

absence of a custodial relationship between the state and the victim, support a civil rights

claim.")  "It is misuse of state authority, rather than a failure to use it, that can violate the Due

Process Clause." Bright, 443 F.3d at 282; see also Kaucher v. Cnty. of Bucks, 455 F.3d 418 (3d

Cir. 2006) ("[T]he fourth element is satisfied where the state's action was the 'but for cause' of

the danger faced by the plaintiff.") (citing Estate of Smith v. Marasco, 318 F.3d 497, 510 (3d Cir.

2003)).

    Here, the City Defendants assert that Plaintiffs cannot establish the first and second

elements of the Bright test. (Defs.' Mot. Summ. J. 14-20.)  Accordingly, because the City

Defendants remarkably[22] concede that Plaintiffs can establish the third and fourth elements, the

Court will limit its discussion to only the first and second elements.

### 1.  Whether the  Harm was Foreseeable and Fairly Direct

    To establish the foreseeability element, a plaintiff must demonstrate "an awareness on the

part of the state actors that rises to level of actual knowledge or an awareness of risk that is

---

[22] The consequences of this concession cannot be understated.  In state created danger cases, no single factor is given more weight than the others.  That said, however, these types of cases often turn on whether the fourth factor — the affirmative act requirement — can be satisfied. See Soberal, Estate of v. City of Jersey City, 334 Fed. Appx. 492 (3d Cir. 2009) (reviewing the conduct of the defendant police officers and finding that the officers' conduct constituted failure to act and not affirmative acts); Ye v. United States, 484 F.3d 634, 635 (3d Cir. 2007) ("The crux of the case before us is whether a mere assurance can be an affirmative act—a 'restraint of personal liberty' similar to incarceration or institutionalization….We hold that it cannot.") (internal citation omitted); Bilbili v. Klein, 249 F. App'x 284, 288 (3d Cir. 2007) (declining to address the first three elements of the state created danger doctrine because the plaintiffs "clearly" could not satisfy the fourth element.).  The fourth factor "arises from the [state-created danger] doctrine's origin as an exception to the general rule that the state does not have a general affirmative obligation to protect its citizens from the violent acts of private individuals." Rivas v. City of Passaic, 365 F.3d 181, 202 (3d Cir. 2004) (Ambro, J., concurring) (citing Estate of Smith v. Marasco, 318 F.3d 497, 506 (3d Cir.2003)).  Without the fourth factor, the state-created danger exception would easily swallow the general rule that the state's failure to protect a person from private violence does not give rise to a due process violation.

    Because the City Defendants have not challenged the sufficiency of Plaintiffs' evidence regarding the fourth factor, the Court does not evaluate Plaintiffs' arguments that Womble's conduct — i.e., changing the goal of William's placement from adoption by the McCreadys to "reunification" with Saunders, Sr. and placing William in the Saunders, Sr./Suttmoeller home — arises to the level of affirmative acts.  The remainder of this Opinion therefore assumes but does not decide that the affirmative act requirement has been met.

sufficiently concrete to put the actors on notice of the harm." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 238 (3d Cir. 2008); see also Gremo v. Karlin, 363 F. Supp. 2d 771, 783-88 (E.D. Pa. 2005) (reviewing Third Circuit case law on the foreseeability element).  Further, to establish the "fairly direct" element, "the plaintiff must plausibly allege that state officials' actions 'precipitated or w[ere] the catalyst for' the harm for which the plaintiff brings suit." Henry v. City of Erie, 728 F.3d 275, 285 (3d Cir. 2013) (quoting Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 910 (3d Cir. 1997)).

Here, in support of their contention that the Plaintiffs cannot establish foreseeability and directness, the City Defendants advance a number of arguments which all ignore much of the undisputed record evidence.  First, the City Defendants contend that "Womble could not foresee the danger that Suttmoeller presented before custody was discharged," and that there were no reports of abuse in Suttmoeller's past.  (Defs.' Mot. Summ. J. 17.)  Additionally, the City Defendants note that Dr. Shack's psychological evaluation of Suttmoeller remarked that Suttmoeller "appear[ed] to have empathy for [William] and truly wish[ed] for him to have a stable and nurturing home." (Id.) (citing Defs.' Ex. G at 6.)

This argument ignores any number of facts.  As an initial matter, it is essential to differentiate between two different discharges in this matter: the temporary discharge of William to Suttmoeller on November 9, 1998, and the permanent discharge of William to Saunders, Sr. and Suttmoeller on April 29, 1999.  Because it is unclear which of the discharges Defendants' argument is referring to, the Court will discuss both.  Prior to the November 9, 1998 temporary discharge, Dr. Shack's November 6, 1998 evaluation of Saunders, Sr. repeatedly noted that Suttmoeller would be William's primary caregiver because Saunders, Sr. would be working.  Thus, although the Family Court had initially only ordered that Saunders, Sr. undergo a

23

psychological evaluation, Dr. Shack "strongly recommended" that Suttmoeller herself undergo an evaluation and emphasized that William "should not be moved until Ms. Suttmoeller's evaluation is completed." (Pls.' Ex. D; Defs.' Ex. G.) Nonetheless, against Dr. Shack's recommendation, the Family Court granted Suttmoeller temporary custody of William on November 9, 1998 — with the qualification that SCOH be provided to William and that Suttmoeller undergo evaluation.  No SCOH were provided for three months, and five months elapsed before Suttmoeller was evaluated.  Thus, the argument could and has been made that Womble and DHS would have been aware of the risk Suttmoeller posed to William had Suttmoeller's evaluation been completed in a timely fashion.

Once Suttmoeller's evaluation was completed on April 16, 1999, the positive observations that the City Defendants now highlight were far outweighed by the number of problematic observations Dr. Shack made.  Dr. Shack alternatively described Suttmoeller as "labile," "angry," "agitated," "grandiose," and "entitled." (Id. at 4, 6.)  Moreover, during the evaluation Suttmoeller herself reported current and past substance abuse, including the night before the evaluation in which Suttmoeller had resorted to drinking because she was "upset over" an unspecified incident with William. (Id. at 3.)  More troubling was Suttmoeller's assertion during the evaluation that she believed William's bedwetting was sometimes done on purpose — an erroneous assertion that was later echoed by both Suttmoeller and Saunders, Sr. following the May 16, 1999 report  of abuse. (Defs.' Ex. L.)  Here again was an opportunity for Womble to be better aware of the risk that Suttmoeller posed to William.  However, Womble did not follow-up on any of the information revealed in Suttmoeller's evaluation, and instead affirmatively represented to the Family Court on April 29, 1999 that Suttmoeller's evaluation "showed no problems for Theresa Suttmoeller to parent/supervise William Saunders." (Pls.' Ex. K.)

24

The Court undertakes the preceding analysis merely for the sake of demonstrating the circularity of the City Defendants' argument.  If prior to April 29, 1999 Womble was unable to foresee the danger William was in, this is largely because Womble's flawed and deficient supervision of William's placement prevented him from having the necessary knowledge or awareness of the danger William faced.  It is therefore somewhat perverse for Womble to claim lack of knowledge when it is his own actions which arguably prevented him from having knowledge.  Nonetheless, the Court recognizes that prior to April 29, 1999, Womble likely did not have actual knowledge or a sufficiently concrete "awareness of the risk" to satisfy the foreseeability element.  The City Defendants are therefore correct in that, prior to the permanent discharge on April 29, 1999, there was little to substantiate whether Suttmoeller had a propensity for violence toward William.

However, the City Defendants have also correctly noted that "a history of violence is not absolutely necessary to create notice," and that it is sufficient that a defendant have "knowledge of a *significantly enhanced risk of harm* to the plaintiff." (Defs.' Mot. Summ. J. 16) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 237 (3d Cir. 2008)) (emphasis added); see also Phillips, 515 F.3d at 237 ("We have never held that to establish foreseeability, a plaintiff must allege that the person who caused the harm had a 'history of violence.' Indeed, these types of cases often come from unexpected or impulsive actions which ultimately cause serious harm.")  After the April 29, 1999 permanent discharge, the May 16, 1999 incident report came just seventeen days later, and the June 23, 1999 incident a little over a month after that.  Thus, within this short time span of just two months, Womble at the very least had an awareness of the escalating risk of physical harm Suttmoeller posed to William — if not actual knowledge.  Accordingly, by June 23, 1999, if not earlier, Womble had sufficiently concrete notice of harm to

William and yet left him in the care of Saunders, Sr. and Suttmoeller.  Even then, although

Womble found the second report of abuse to be "substantiated," for three weeks afterward

Womble failed to locate or interview William, and did not complete his investigation of the June

23, 1999 incident until after the grievous July 14, 1999 incident had already occurred.

Next, the City Defendants argue that "Womble could not foresee that Saunders, Sr., who

seemed to be 'a genuine person who is making a valiant effort with regard to his son's

disposition and needs,' would simply let his fiancée abuse his son." (Defs.' Mot. Summ. J. 17.)

(quoting Saunders, Sr.'s November 6, 1998 Report of Mental Health Evaluation).  This argument

ignores the fact that the anonymous individual who reported the May 16, 1999 incident

specifically reported that Suttmoeller was "seen hitting on [the] child outside in front of

neighbors" while Saunders, Sr. was present but "fail[ed] to say or do anything to protect"

William. (Defs.' Ex. L.)  Not coincidentally, the anonymous individual who reported the June 23,

1999 incident also reported that Saunders, Sr. was "seen standing with his arms crossed watching

mother beat child." (Defs.' Ex. M.)[23]  Following the May 16, 1999 incident, Saunders, Sr.

"denied standing around" while Suttmoeller abused William, but he did express his belief that

William was wetting his pants on purpose. (Id.)  Suttmoeller, for her part, confirmed that she

spanked William for wetting his pants. (Id.) Thus — even if one accepts the dubious notion that

Saunders, Sr. was never present when Suttmoeller was violent toward William — by May 16,

1999 both Saunders, Sr. and Womble were at the very least aware that Suttmoeller posed a risk

of harm to William on occasions when Saunders, Sr. was not present (which was most of the

time).

The City Defendants then go on to argue that the harm William suffered cannot be

---

[23] Also not coincidentally, while Suttmoeller was "banging [William] into the walls" on July 14, 1999, Saunders, Sr. was reportedly inebriated and in the home — again doing nothing to intervene. (Defs.' Ex. N.)

interpreted as the direct result of Womble's actions because Womble recommended that William remain committed to DHS.  Thus the City Defendants, in an apparent attempt to transfer responsibility onto the Family Court, emphasize that it was the Family Court that made the ultimate decision to award custody to Saunders, Sr. and Suttmoeller.  This argument ignores the fact that, in making its dependency determinations, the Family Court is reliant on the information provided to it by a number of interested parties, including caseworkers like Womble.  The City Defendants are correct that, on November 9, 1998, the Family Court made the decision to grant Suttmoeller *temporary* physical custody of William even though Womble was apparently of the opinion that, consistent with Dr. Shack's recommendation, Saunders, Sr. and Suttmoeller should not receive custody until Suttmoeller's evaluation was completed.  (Defs.' Ex. H.)[24]  But Womble's responsibility to William did not end on November 9, 1998.  Womble clearly understood that DHS still reserved responsibility for supervising the provision of SCOH, and ensuring that Suttmoeller's evaluation was completed. (Defs.' Ex. H.; Pls.' Q.)  There was significant delay in complying with both of these obligations.  After Suttmoeller's evaluation was eventually completed, Womble represented to the Family Court that Suttmoeller's evaluation revealed "no problems" in Suttmoeller parenting William.  Plaintiffs have argued that this statement constitutes a "misrepresentation" by Womble.  A reasonable jury could agree.  It was only following Womble's representation that the Family Court made the determination to grant Saunders, Sr. and Suttmoeller *permanent* custody of William.[25]  Thus, it is Womble's act

---

[24] The Court therefore disagrees with Plaintiffs' assertion that "there is no record that Womble advocated at the hearing on November 9, 1998 that William remain with the McCreadys." (Pls.' Resp. Opp'n Mot. Summ. J. 17.) Womble's contemporaneous notes state his opinion that Suttmoeller should be evaluated before custody was awarded to Saunders, Sr. and Suttmoeller.  It is only fair to assume that his written opinion is an accurate reflection of what he advocated before the Family Court.

[25] Even before this, on February 16, 1999, Womble had recommended that DHS supervision of William be terminated even though no SCOH had yet been provided to William as of February 16, 1999; Suttmoeller still had not undergone the psychological evaluation recommended by Dr. Shack on November 6, 1998 and ordered by the

of representing to the Family Court that Suttmoeller's evaluation revealed "no problems" that directly precipitated DHS custody being discharged.  "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982); see also Morrow v. Balaski, 719 F.3d 160, 177-78 (3d Cir. 2013) cert. denied, 134 S. Ct. 824, 187 L. Ed. 2d 686 (U.S. 2013) and Ye v. United States, 484 F.3d 634, 637 (3d Cir. 2007) (approvingly citing Bowers).

Accordingly, the Court finds the City Defendants have failed to meet their burden of showing that no genuine issues of material fact exist as to whether the harm William suffered was foreseeable and fairly direct.

### 2.   Whether Womble's Conduct Shocks the Conscience

The City Defendants next argue that the record does not support a claim that Womble acted with a degree of culpability that shocks the conscience. "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999).  The Third Circuit has articulated three possible standards that can be used to determine whether state action shocked the conscience: deliberate indifference, gross negligence or arbitrariness, or intent to cause harm.  Sanford v. Stiles, 456 F.3d 298, 306 (3d Cir. 2006).  Here, the parties agree that the deliberate indifference standard applies to the facts of this case. (Defs.' Mot. Summ. J.19; Pls.' Resp. Opp'n Mot. Summ. J. 19 & n.2.)  The Court agrees, as the record illustrates that Womble had many months to consider the dangers posed by placing William in the Saunders,

---

Family Court on November 9, 1998; and a period of more than three months had elapsed in which DHS had had no contact or supervision of William's placement in the Saunders, Sr./Suttmoeller home.  The Family Court did not follow Womble's recommendation at that time.

Sr./Suttmoeller home.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 851, 118 S. Ct. 1708,

1719, 140 L. Ed. 2d 1043 (1998) ("As the very term 'deliberate indifference' implies, the

standard is sensibly employed only when actual deliberation is practical.") (internal citation

omitted); see also Phillips, 515 F.3d at 241 (finding the deliberate indifference standard applied

because the defendants "had sufficient time to proceed deliberating" and "[t]here [was] no sense

of urgency or emergency.")

    In Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the

Supreme Court clarified the deliberate indifference standard applicable in suits challenging

prison conditions under the Eighth Amendment.  "'Deliberate indifference' describes a state of

mind more blameworthy than negligence but less blameworthy than 'purpose or knowledge of

causing harm.'" Talley v. Amarker, CIV.A. 95-7284, 1996 WL 660932, at *2 (E.D. Pa. Nov. 13,

1996) (quoting Farmer, 511 U.S. at 836).  Deliberate indifference can be shown when an official

"knows of and disregards an excessive risk to…health or safety." Farmer, 511 U.S. at 837.

"[T]he official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." Id.  Accordingly, to

overcome a motion for summary judgment, a plaintiff must offer evidence that the official was

"subjectively aware of the risk" of serious harm to the plaintiff, and disregarded that risk by

failing to take reasonable measures to stop it. Id. at 829; see also Nicini v. Morra, 212 F.3d 798,

811-15 (3d Cir. 2000) (en banc) (applying deliberate indifference standard to case involving

caseworker who had time "to make unhurried judgments" in investigating whether to permit

minor to remain with para-foster family).

    Here, in arguing that Plaintiffs cannot establish deliberate indifference, the City

Defendants advance essentially the same arguments they made in arguing that the harm to

William was not foreseeable and fairly direct.  Specifically, the City Defendants again emphasize that Womble recommended that William remain in DHS custody, and argue that Womble was not deliberately indifferent based on the knowledge he had at the time Saunders, Sr. was given custody. Additionally, the City Defendants again focus the Court's attention on the few favorable comments in Suttmoeller's evaluation, and emphasize that it was the Family's Court's decision to discharge DHS supervision and custody.  For the reasons previously discussed, the Court does not find these arguments persuasive.  Additionally, it is again important to distinguish between the two relevant time periods: what Womble knew before DHS custody was permanently discharged on April 29, 1999, and what he knew shortly thereafter from the May 16, 1999 and June 23, 1999 incident reports.

For events prior to April 29, 1999, it is Plaintiffs' position that Womble was deliberately indifferent because he formulated certain opinions and made certain recommendations with respect to William's placement even though he lacked sufficient information for formulating these opinions and recommendations.  Essentially, Plaintiffs contend that Womble's investigation and supervision of William's placement with Sanders, Sr. and Suttmoeller was deficient in many respects.  For instance, sometime between May 1997 and October 7, 1998, Womble changed the "goal" of William's placement from adoption by the McCreadys to "reunification" with Saunders, Sr. and Suttmoeller — even though William had no preexisting relationship with Saunders, Sr. or Suttmoeller and Womble had never attended any of Saunders, Sr. and Suttmoeller's supervised visits with William at IYC.  Nine days after this goal change was made, Womble completed a risk assessment of Saunders, Sr. and Suttmoeller, and concluded that the couple posed only a "moderate risk" to William. (Pls.' Ex. N.)  Womble reached this conclusion even though, in certain key categories, Womble had himself noted that

30

he was "unable to assess" the couple, and that DHS did not "know enough" about Saunders, Sr. and Suttmoeller because DHS had had "little exposure" to them. (Id.)  This patently incomplete risk assessment was the only risk assessment performed prior to granting Suttmoeller temporary custody of William.  By November 9, 1998, Suttmoeller was given temporary physical custody of William by the Family Court — *without* Suttmoeller's recommended psychological evaluation having been completed but *with* the qualification that William receive SCOH and that Suttmoeller undergo a court ordered evaluation.

By the time of the February 16, 1999 dependency review hearing, neither of these requirements had happened. In fact, for more than three months DHS had had no contact or supervision of William's placement in the Saunders, Sr./Suttmoeller home.[26]  Nonetheless, Womble recommended to the Family Court at this hearing that DHS custody be discharged — a recommendation which the Family Court did not adopt.  Subsequently however, after receiving the April 16, 1999 report of Suttmoeller's evaluation, Womble made no attempt to follow-up on the more concerning aspects of Suttmoeller's evaluation and did not encourage Suttmoeller or Saunders, Sr. to complete Dr. Shack's recommendations.  Instead, Womble affirmatively represented to the Family Court that the evaluation revealed "no problems," and again recommended to the Family Court that DHS custody be discharged.  Only then did the Family Court, acting on Womble's recommendation, permanently discharge William from DHS custody.

---

[26] Dr. Gelles, Plaintiffs' expert, opines:

> In not complying with the court order Mr. Womble deprived William Saunders, Jr. of SCOH services that were to ensure his safety and well-being.  In addition, since no professional visited or observed William Saunders, Jr. for more than three months, there was no surveillance as to the status of the child, his well[-]being or the parenting ability of his father and Ms. Suttmoeller—[a]ll of which were vital information unknown to DHS at the time of the goal change and remained unknown throughout the placement.

(Pls.' Ex. BB at 7.)

Plaintiffs and their expert, Richard J. Gelles ("Dr. Gelles"), have argued that Womble's assertion that Suttmoeller's evaluation revealed "no problems" was a misrepresentation on Womble's part.  Additionally, Dr. Gelles opines that this series of alleged failures by Womble fell below the standard of care for placement of a child as stated in DHS' Children and Youth Policy and Operations Manual. (Pls.' Ex. BB at 4-5, 8) ("Gelles Report").  The Court finds there are genuine issues of material fact as to whether Womble was deliberately indifferent during the events prior to April 29, 1999.  A reasonable jury could find that Womble's actions prior to April 29, 1999 failed to comply with agency procedure and thereby amounted to disregard of the risk Suttmoeller posed to William. Cf. Nicini v. Morra, 212 F.3d at 812-15 (Caseworker for state social service agency not deliberately indifferent to substantive due process right of minor in agency custody absent evidence that caseworker violated any state requirement or agency policy or procedure in conducting investigation of para-foster family, or evidence of specific information placing caseworker on notice that family warranted more detailed investigation).

After April 29, 1999, there is little question that there are genuine issues of material fact as to whether Womble was deliberately indifferent.  Womble was assigned to investigate the initial report of abuse precisely because he was William's previous caseworker.  The justification for assigning an investigation into potential child abuse to a child's previous caseworker is obvious: the previous caseworker presumably has familiarity with the child and the family, and is able to view the report of abuse within the context of his previous interactions with the family. Womble, however, noted the scab above William's eye, but made no attempt to determine how the injury occurred.  Further, no medical evaluation was performed, even though Womble's conversation with officials at William's school revealed that they had seen William with faded dark marks of indeterminate cause.  Womble also interviewed William while Saunders, Sr. and

Suttmoeller were present, and ignored obvious inconsistencies between what they reported. For example, while William denied that Suttmoeller hit him for wetting his pants, Suttmoeller freely admitted that she did spank William for wetting his pants. (Defs.' Ex. L.)  Suttmoeller also informed Womble that she *would* spank William again, but Womble's report nonetheless concluded that Suttmoeller would "not continue to beat [the] child." (Id.)  Womble's subsequent June 11, 1999 risk assessment concluded that the "overall severity" and "overall risk" to William of remaining in the Saunders, Sr./Suttmoeller home was "low." (Defs.' Ex. L.; Pls.' Ex. Z.)[27]  Dr. Gelles' again notes the ways in which Womble's investigation allegedly failed to comply with DHS policy. (Gelles Report at 9-10.)

Subsequently, Womble found the June 23, 1999 report of child abuse to be "substantiated." (Defs.' Ex. M.)  Nonetheless, Womble apparently made no attempt to locate or interview William in the next three weeks, before the July 14, 1999 incident.  Indeed, Womble's report of the June 23, 1999 incident was not completed until after the July 14, 1999 incident, which was of course too late.  Dr. Gelles' again notes the ways in which Womble's investigation allegedly failed to comply with DHS policy. (Gelles Report at 10-12.)  In sum, with respect to the two reports of child abuse, Dr. Gelles opined:

> State law, the court order, and the Operations Manual explicitly state the caseworker's responsibility in the placement of a child and how to carry out an investigation of suspected child maltreatment.  Mr. Womble, an experienced case worker, was indifferent to the substantial risk of injury to William Saunders[,] Jr.  Mr. Womble placed William Saunders, Jr. in a dangerous home and allowed him to remain in a dangerous home until William Saunders, Jr. was grievously injured by Ms. Suttmoeller.

A reasonable jury could agree.

---

[27] Curiously, Womble had assessed Suttmoeller and Saunders, Sr. as a "moderate" risk (which is higher than "low") back when he conceded little was known about them. (Compare Pls.' Ex. N [October 16, 1998 Risk Assessment] with Defs.' Ex. L. and Pls.' Ex. Z [June 11, 1999 Risk Assessment]).

Accordingly, based on the foregoing, the Court finds Plaintiffs have presented sufficient evidence from which a jury could decide that Womble was deliberately indifferent, establishing a level of culpability that is conscience-shocking.

## C.  Qualified Immunity

Having determined that genuine issues of material fact remain as to whether William's constitutional right was violated by the City Defendants, the question remains as to whether Womble is entitled to immunity.  See Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); Miller, 174 F.3d at 374 ("The proper approach…is to ascertain whether a constitutional violation has been alleged *before* determining if qualified immunity is available.") (emphasis in original).  Here, the City Defendants claim Womble is immune from liability under the doctrine of qualified immunity. (Ans. at 13.)[28]

---

[28] In the Motion for Summary Judgment, the City Defendants acknowledge that "DHS caseworkers are not generally entitled to blanket absolute immunity," but nonetheless also contend that Womble is entitled to both prosecutorial immunity and judicial immunity. (Defs.' Mot. Summ. J. 20-22) (citing  Ernst v. Child & Youth Servs. of Chester Cnty., 108 F.3d 486 (3d Cir. 1997) and Hughes v. Long, 242 F.3d 121 (3d Cir. 2001)).  Womble did not assert absolute immunity as an affirmative defense in the City Defendants' Answer, and cannot belatedly do so now. Moreover, even if Womble had pleaded absolute immunity, both Ernst and Hughes are distinguishable from the facts and allegations of the instant case.

In Ernst, the Third Circuit held that social workers were absolutely immune "for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency hearings." Ernst, 108 F.3d at 495. The immunity extended to "the formulation and presentation of recommendations to the court in the course of such proceedings." Id. In reaching this conclusion, the Third Circuit reasoned that "the functions performed by [social service workers] in dependency proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings." Id.  Here, however, Plaintiffs claim against Womble is based on Womble's investigative and administrative acts.  Specifically, Plaintiffs charge that "Womble cannot claim absolute immunity related to his actions involving his administrative changing of William's goal from reunification, or his superficial investigations of the allegations of abuse against Suttmoeller." (Pls.' Resp. Opp'n Mot. Summ. J. 20.)  This is indeed the case. See Ernst, 108 F.3d at 497 n.7  ("We emphasize that our holding concerns only actions taken by child welfare workers in the context of dependency proceedings. Like our sister courts in the Fifth, Sixth, Seventh, and Tenth Circuits, we would be unwilling to accord absolute immunity to 'investigative or administrative' actions taken by child welfare workers outside the context of a judicial proceeding.") (internal citations omitted); see also Miller, 174 F.3d 368, 376 n. 6.  Further, the City Defendants concede "Womble did not institute custody proceedings, nor take legal custody from any parent." (Defs.' Mot. Summ. J. 22.)

Hughes is also distinguishable because that case involved claims brought against two court-appointed evaluators. There, the Third Circuit ruled the evaluators were "entitled to judicial immunity because they acted as 'arms of the court' and performed functions integral to the judicial process." 242 F.3d at 127. In this way, the evaluators were "similar to a guardian ad litem or a court-appointed doctor or psychologist, a non-judicial person who fulfills a quasi-judicial role at the court's request." Id. at 126.  Further, the Third Circuit specifically emphasized that the evaluators, "in formulating and making their recommendations to the court," "were not 'advocates of the

When a potential substantive due process violation is found to exist under the state–created danger exception, the doctrine of qualified immunity may be placed at issue as part of the defense to the claim.  See Siegert, 500 U.S. at 226.  Qualified immunity protects public officials from liability under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  Thus, in applying qualified immunity, courts consider whether at the time of the conduct the right was clearly established.  Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

Here, the entirety of the City Defendants' argument that Womble is entitled to qualified immunity is as follows:

> [N]o constitutional right was violated in this case because the State has no constitutional duty to protect citizens from private harm. Womble, a government official who performs discretionary functions as a DHS social worker is, therefore, entitled to qualified immunity against the instant claim.  Furthermore, it would not have been sufficiently clear for Womble to know that the reunification of a boy and his biological father, after positive psychiatric evaluation and no history of abuse, would be a constitutional violation. Thus, even assuming a constitutional violation, arguendo, the [P]laintiffs' claim must fail.

(Defs.' Mot. Summ. J. 23.)  This argument misses the mark.  The Court first notes that the City Defendants have conflated the question of whether there has been a deprivation of a constitutional right with the question of whether Womble is entitled to qualified immunity. These questions are separate, and are therefore addressed through a two-step inquiry.  A court only reaches the question of whether a defendant is entitled to qualified immunity if it has first determined that there has been a deprivation of a constitutional right.  This Court has found that a reasonable jury could conclude that Womble violated William's constitutional right to be free

---

State' like prosecutors and *child welfare workers*." Id. (emphasis added).  The City Defendants' reliance on Hughes is therefore incorrect.

from affirmative state action that placed him in an environment where there was a foreseeable

risk that he would suffer physical harm.  Having reached this conclusion, the second step in the

qualified immunity analysis requires the Court to determine whether this right was clearly

established in the existing law at the time of the alleged violation.  Harlow, 457 U.S. at 800; see

also Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002)

(Qualified immunity operates "to ensure that before they are subjected to suit, officers are on

notice their conduct is unlawful.") (quoting Saucier v. Katz, 533 U.S. 194, 206, 121 S. Ct. 2151,

2158, 150 L. Ed. 2d 272 (2001)).

　　　　The inquiry as to whether a constitutional deprivation was clearly established "must be

undertaken in light of the specific context of the case, not as a broad general proposition." Curley

v. Klem, 298 F.3d 271, 277 (3d Cir.2002) (quoting Saucier, 533 U.S. 194).  The state of the law

at the time of the alleged violation must give defendants "fair warning that their treatment of [the

plaintiff] was unconstitutional." Hope, 536 U.S. at 741.  A constitutional right is established if it

is sufficiently clear and well-defined so that "a reasonable official would understand that what he

is doing violates that right." Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d

Cir.2004) (internal citations omitted).  Even if a reasonable state actor would so understand, the

defendant may still be shielded from liability if he or she made a reasonable mistake as to what

the law requires. Id.

　　　　At the time of the alleged violation herein, the law of this Circuit was clear that

government actors can be held individually liable for due process violations when they have

created the danger. Kneipp, 95 F.3d at 1211 (holding, in September 1996, that "the state-created

danger theory is a viable mechanism for establishing a constitutional claim under 42 U.S.C. §

1983."); see also Wyatt v. Krzysiak, 82 F. Supp. 2d 250, 261 (D. Del. 1999) ("The decisional

law of the Third Circuit… failed to clearly establish the state created danger doctrine as a viable theory prior to Kneipp in September, 1996.  In Kneipp, the appellate court expressly adopted the state created danger theory and the four prong test for its analysis.  Prior to Kneipp, the Third Circuit Court of Appeals expounded on the elements of the test and recognized its existence in other circuits, but *expressly* refused to adopt it.") (emphasis in original and internal citations omitted).

Framing the question at a lower level of generality, the question becomes whether Womble had reason to know that his actions with respect to William in 1998 and 1999 placed William in dangerous environment.  Plaintiffs, like the plaintiff in Nicini, frame this as William's "constitutional right to be free from placement in a foreseeably dangerous home based on 'an investigation so lacking in thoroughness and precision that it can be said to shock the conscience.'" (Pls.' Resp. Opp'n Mot. Summ. J. 22) (quoting Nicini, 212 F.3d at 806).  The Court finds that a reasonable person in Womble's position would have understood that failure to adequately investigate the individuals with whom a child is placed could lead to that child being relegated to a dangerous home, in violation of the child's constitutional rights.  As has been extensively discussed, the record demonstrates that Womble took a series of affirmative steps toward "reunifying" William with Saunders, Sr. and Suttmoeller despite the fact that he had little to no information regarding how the couple interacted with William, and whether their home was a safe environment for him.  Further, these affirmative steps included representing to the Family Court that Suttmoeller's evaluation revealed "no problems," and failing to adequately investigate two reports of abuse made shortly after DHS custody of William was permanently discharged. For these reasons, Womble cannot claim qualified immunity based on the assertion that "it would not have been sufficiently clear for Womble to know that the reunification of a boy and

his biological father, after positive psychiatric evaluation and no history of abuse, would be a constitutional violation" when it is the very thoroughness of Womble's investigation which is at issue.  Thus, the Court finds Womble is not entitled to qualified immunity.

### D.  Municipal Liability

Finally, the Court must determine whether summary judgment should be granted on Plaintiffs' municipal liability claim.  A municipality may not be held liable for the acts of its employees under a theory of respondeat superior or vicarious liability.  Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  Rather, "a plaintiff seeking to impose liability on a municipality under § 1983 [must be able] to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997) (internal citations omitted).

Not every action by a municipality rises to the level of a policy or custom.  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003).  A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Id. (quoting Kneipp, 95 F.3d at 1212).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Id. (quoting Bryan County, 520 U.S. at 404); see also Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989) ("Custom may be established by proof of knowledge and acquiescence." (internal citation omitted).  Thus, "absent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation" based on a policy or custom." Simmons v. City of Philadelphia, 947 F.2d 1042, 1063 (3d Cir. 1991).

Here the City of Philadelphia, in conclusory fashion, argues:

> In the instant matter, there is none of the 'scienter-type evidence' of a policymaker that is required to hold the City liable.  <u>Simmons v. City of Philadelphia</u>, 947 F.2d at 1063. Further, Plaintiffs have adduced no evidence of a pattern or practice of violating citizens' constitutionally protected rights, or of the conscious decision or deliberate indifference to the rights of citizens.

The Court disagrees.  Plaintiffs have pointed to a number of DHS policies and customs which a reasonable jury could conclude caused or contributed to William's injury.  First, although Womble was William's assigned caseworker, and is the only individual city defendant in this action, it is important to remember that he did not act alone.  Many of Womble's reports, such as the risk assessments he completed, were signed off on by his supervisor, Kauderer.  But even though Kauderer now describes Suttmoeller's evaluation as "horrendous," Kauderer also acknowledges that she may not have actually seen the evaluation at the time because often a supervisor may be away or not be involved in actual supervision of a caseworker, but nonetheless would have to sign off on such reports because the caseworker was assigned to that supervisor's unit. (Kauderer Dep. 31:11-32:10.)  Accordingly, by Kauderer's own admission, DHS had a clear policy or custom of permitting supervisors to routinely sign off on reports they may not have reviewed in cases in which they did not actively supervise the caseworker.  Thus, to the extent DHS case workers were improperly performing their jobs, it is arguable that DHS supervisors were complicit in permitting this to happen.  Plaintiffs argue that "[t]hese inadequacies of DHS policy led to a lack of insight into (and oversight of) the caretakers with whom DHS placed William, leading to foreseeable consequences." (Pls.' Resp. Opp'n Mot. Summ. J. 23.)  A reasonably jury could agree.

Further, Plaintiffs have questioned the City of Philadelphia's policy or custom of classifying William's placement with Saunders, Sr. and Suttmoeller as a "reunification"— even

though it is undisputed that Saunders, Sr. had been uninvolved in William's life since the first

year of his birth; William had never lived with Saunders, Sr.; Suttmoeller was an unrelated

woman to whom Saunders, Sr. was not legally married; and Suttmoeller would act as William's

primary caregiver even though she had no prior relationship with him.  Womble himself testified

that even though Saunders, Sr. was "essentially a stranger" to William, "[i]t was not an unusual

practice at the Department of Human Services" to consider this a "reunification."  Plaintiffs have

argued that this classification is significant "because unlike the placement of a child with an

unrelated person [like the McCreadys], or relative, which requires a thorough background

evaluation, DHS had no policies or procedures regarding reunification and no regulations to

investigate the placement of a child under these circumstances with an unrelated caregiver."

(Pls.' Resp. Opp'n Mot. Summ. J. 7) (citing Schamber Dep. 37-5-10; 41:10-22.)  By comparison,

according to Dr. Gelles, DHS policy had detailed requirements for: (1) investigating and training

foster parents; (2) requiring the child to have a doctor's visit within sixty days of placement; (3)

a home inspection; and (4) strict prohibition of corporal punishment. (Gelles Report at 5.)  A

reasonable jury could find that this policy of favoring placement of a child with a previously

absent biological parent and their unrelated companion over a suitable foster family — and then

holding those individuals to a lesser standard than what would be required of foster parents —

caused the deprivation of William's due process rights.

Still further, Plaintiffs have questioned the DHS policy and custom of not locating a child

after a report of abuse.  In particular, Plaintiffs argue that following the June 23, 1999 report of

abuse, "Womble and DHS were provided a final opportunity to spare William from the violent

and dangerous situation in which they had placed him[;] however, the policy and custom of DHS

to not locate and lay eyes on William resulted in the tragic fate that befell him three weeks later.

(Pls.' Resp. Opp'n Mot. Summ. J. 24.)  Indeed, in the short span of just two months after DHS custody was permanently discharged, DHS had received two reports of Suttmoeller's violence toward William. On both of those occasions, Suttmoeller freely confirmed that she beat William. Moreover, Suttmoeller dared the reporter of the second incident to "go ahead call the police and DHS" and threatened to "take [William] into another room and beat him" (i.e. be more private about her abuse of William). (Defs.' Ex. M.)  The caller also advised that William had not been seen since Suttmoeller made this threat. (Id.)  True to her word, William was unavailable when Womble went to investigate the second incident.  Even though Womble considered William's absence "unusual," he nonetheless did not endeavor to locate William to interview him or assure his physical safety.  For three weeks, Womble did not follow-up on William's case.

However, the testimony of Womble and his supervisors establishes that Womble was following DHS custom by not taking steps to locate William, at his father's job or elsewhere. Womble's administrator testified that it was not recommended for a caseworker to go to a parent's place of employment to locate a child, and it was also not the custom to involve the police or other governmental authority to help locate the child. (Schamber Dep. 26:13-27:3, 84:6-85:14.)  Rather, it was the custom of DHS to go back to the home at some later time. (Id. 84:13-85:14.)  Plaintiffs contend that had DHS had policies in place to ensure that Womble or someone else saw William in the three weeks between June 23 and July 14, 1999, William could have been spared the grievous injury he ultimately suffered.  A reasonable jury could agree.

Accordingly, summary judgment is denied on Plaintiffs' municipal liability claim.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is denied in all respects.  An appropriate order follows.

41